### FLEMING HOSPITAL, INC. et al. v. WILLIAMS et al.

No. 9315.

Court of Civil Appeals of Texas. Austin.

Feb. 24, 1943.

Rehearing Denied March 10, 1943.

J. V. Fleming, of Tyler, for appellants.

Gerald C. Mann, Atty. Gen., Morris Hodges and Lee Shoptaw, Asst. Attys. Gen., and W. H. Farmer, of Austin, for appellees.

BLAIR, Justice.

Appellants, Fleming Hospital, Inc., and Dr. J. V. Fleming, sued appellees, Claude A. Williams, C. R. Miller, and R. A. McKinley, as members constituting the Texas Unemployment Compensation Commission, seeking to enjoin appellees from collecting certain contributions or taxes and penalties claimed to be due under the Texas Unemployment Compensation Act. Arts. 5221b—1 to 5221b—24, Vernon's Ann.Civ. Sts. Appellees requested the intervention of the State, and by way of cross-action the State through its Attorney General sued for the contributions or taxes and penalties alleged to be due by appellants, aggregating $110.76.

The issues before the Commission and before the trial court on the statutory appeal from the Commission's action in the premises, and here, are two, as follows:

1. Whether appellant. Fleming Hospital, Inc., is a charitable institution and exempt from paying the contributions or taxes demanded of it under the provisions of Art. 5221b—17, Sec. (g) (5) (G), Vernon's Ann. Civ.St., which read: "(G) Service performed in the employ of a corporation, community chest, fund, or foundation, or-

ganized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation."

2. Whether appellants, Fleming Hospital, Inc., and Dr. J. V. Fleming, can be considered as one employment unit under the provisions of Art. 5221b—17, Sec. (f) (4), which reads: "(4) Any employing unit which, together with one or more other employing units, is owned or controlled (by legally enforceable means or otherwise) directly or indirectly by the same interest, or which owns or controls one or more other employing units (by legally enforceable means or otherwise), and which, if treated as a single unit with such other employing unit, would be an employer under Paragraph (1) of this subsection".

In 1938 Dr. J. V. Fleming erected a building to house a hospital, a clinic, and his offices, and as owner so operated same until February 1, 1940. He employed more than eight employees and paid the contributions or taxes due under the Texas Unemployment Compensation Act. On February 1, 1940, he, his wife, Frances Fleming, and his father, J. V. Fleming, Sr., organized the Fleming Hospital, Inc., the three constituting the Board of Directors of the corporation. It has no capital stock, but issues certificates to its members, which determine their voting rights; each director having one vote. Its charter provides that: "Said corporation is not organized and its business shall not be conducted for profit, but it may charge for its services to enable it to carry on said business, the payment of salaries of employees, taxes, rental for necessary hospital buildings and acquiring hospital supplies, etc., necessarily used in the maintenance and operation of a hospital."

On February 1, 1940, the Board of Directors elected J. V. Fleming, Sr., president of the corporation, and passed a resolution entitled "Superintendent and Operation," which reads: "After further discussion of the operation of said Hospital, it was moved, seconded, duly passed by the Board of Directors, that Dr. Joe V. Fleming was elected Superintendent of said Fleming Hospital, Inc. with power and authority in behalf of said Corporation to employ and discharge any and all employees of said Corporation, and also to fix their compensation or salary, and to establish all rules and regulations of the operation of said Hospital, which may be necessary; and fix the charges for its services to the public, which may patronize it, subject to any further action of the Board of Directors or the majority vote of the holders of the Member Certificates."

On the same day, February 1, 1940, the Board of Directors approved and Dr. J. V. Fleming executed a lease of his hospital, buildings, and grounds to said Fleming Hospital, Inc., for $200 per month, payable out of the income of the corporation after the payment of its expenses of operation; the corporation also agreeing to pay out of its income all taxes and insurance on the property. The lease reserved to Dr. Fleming the portion of the building theretofore used by him as his offices and clinic, which he continued to operate individually. The income of the corporation for the remainder of the year 1940, and the year 1941, was not sufficient to meet all operating expenses and pay all of the $200 monthly rental, but the amount it did pay as rental was not shown. The lease contract obligated Dr. Fleming to pay three named employees, one of whom was elected secretary of the corporation, and who kept books for both Dr. Fleming and the corporation. Dr. Fleming continued to carry on his private practice and clinic in the portion of the building reserved to him, and on the books he assigned three of the employees to himself and six or more of them to the corporation, the combined number so employed being at all times sufficient to bring them under the Unemployment Compensation Act. After this transfer of employees Dr. Fleming sought of the Unemployment Compensation Commission a release of his liability individually for the contributions or taxes prescribed by the statutes and as theretofore paid by him. Except as to these mentioned matters Dr. Fleming, individually and as superintendent, continued to operate the hospital in the same manner as he had operated it privately.

No patient was admitted strictly as a charity patient, although none was turned down because of inability to pay for hospital services. All patients received in the hospital were the patients of Dr. Fleming,

although he testified that the corporate charter provided that any doctor could use the hospital by paying the prescribed amount fixed for the services rendered. The books show that all patients were charged for the hospital services rendered them; and as to pay, part pay, and non-pay patients for the period involved, the books show as follows:

|  | "1940 | 1941 |
| --- | --- | --- |
| "Paid Patients | 200 | 257 |
| Part Paying Patients | 22 | 43 |
| Non-Paying Patients | 17 | 14" |

These unpaid accounts are still sought to be collected.

No money dividend or profit as such is paid from the income of the hospital corporation to any of its certificate holders; but the facts above detailed show that Dr. J. V. Fleming and his wife who constitute two-thirds of the voting directors of the corporation, receive private benefit and pay from the income of the corporation. In the first place, they receive under the rental contract the sum of $200 per month plus all taxes and insurance as rental for their private property; which is apparently community property, but if not, then the rental received therefrom is community property. Under the lease contract and the resolution appointing Dr. Fleming as superintendent of the hospital corporation, he is required to charge patients enough hospital fees to pay out of such income the rentals, taxes and insurance on such private property.

In the second place, Dr. Fleming testified that the setup whereby he reserved a part of the hospital building for his private practice, the use of the hospital, and his control of the hospital corporation under the resolution of the directors, of which he and his wife constitute two-thirds, is beneficial and "it is quite a convenience." This arrangement is one which no other doctor could have or enjoy, and no doubt results in a larger personal income to Dr. Fleming's private practice; and which income is the community property of himself and his wife. The facts conclusively show that such corporation is not one "organized and operated exclusively for * * * charity," as defined by the above quoted statute.

Dr. Fleming also testified as follows:

"Q. Doctor, why did you incorporate the Fleming Hospital, Incorporated? A. The chief reason for incorporating the hospital was for protection.

"Q. Protection against damage suits? A. Yes, it is rather risky business to carry on a thing like that, although we have insurance in our own name.

"Q. At the same time you do know that once in awhile hospitals and doctors are sued for misfeasance or negligence or some other obligation, and you had that in mind? A. As I stated, that was our reason for the corporation."

Such reason does not make of the corporation an "exclusively * * * charitable" corporation within the meaning of the statute. Such reason is admittedly for the private benefit of Dr. Fleming and the estate of himself and his wife.

No Texas case is cited or found relating to this issue, but the case of California Employment Commission v. Betthesda Foundation, Cal.App., 128 P.2d 874, 876, which construes a statute identical to ours and on facts entirely similar, decides the issue against appellants, and holds that under such facts the Commission and the trial court on appeal are not bound by the articles of incorporation, but "could take into consideration the actual conduct of defendant and its methods of operation"; and further that: "In making its findings the trial court could properly take into consideration the fact that defendant was incorporated shortly after the enactment of the statute sought to be enforced by this litigation; that without assets of its own it took over a private institution which it continued to operate with the same staff which had previously operated it; that it received no gifts or donations from individuals or from the Community Chest or any similar organization; that it has no legal obligation whatever to perform any particular act of charity; that the institution under defendant's control was operated and maintained upon revenue derived wholly from fixed charges against its patients."

In support of their contention that Fleming Hospital, Inc., is a charitable corporation, appellants cite the cases of Santa Rosa Infirmary v. City of San Antonio, Tex.Com.App., 259 S.W. 926; Baylor University v. Boyd, Tex.Civ.App., 18 S.W. 2d 700; and Enell v. Baptist Hospital, Tex. Civ.App., 45 S.W.2d 395, writ of error refused. These cases are not in point. They deal with the liability of charitable

corporations for tort. The hospitals involved in these cases were founded by religious organizations with both public and private contributions and gifts, and purely for charity. The courts held that the fact they received pay from some patients to whom they extended benefits did not detract from their character as purely charitable institutions. No such facts exist in the instant case. Here the issue involved under the statute is whether Fleming Hospital is operated "exclusively" as a charitable institution, the issue of tort liability not being involved. No patient is admitted as a strictly charity patient. No contributions or gifts support the institution, and two-thirds of its directors receive rentals, taxes and insurance on their private property from the income derived from the patients; and because of the setup and as operated Dr. Fleming receives benefits and conveniences in his private practice which no other doctor can receive.

No Texas case construing the meaning of the words "exclusively for * * * charity," as used in the Unemployment Compensation Act is cited or found. The decisions of courts of other states having identical statutes have construed the word "exclusively" with respect to scientific, literary and educational exemptions, and hold that the word should be given its full and literal meaning, and that unless such corporations are organized and operated exclusively for such purposes the exemption does not apply. The Colony Town Club v. Michigan Unemployment Compensation Commission, 301 Mich. 107, 3 N.W. 2d 28; and Consumers' Research, Inc., v. Evans and Board of Review (New Jersey Unemployment Compensation Commission), 128 N.J.L. 95, 24 A.2d 390, 392, wherein the Supreme Court held that a non-profit organization incorporated to assemble information and to conduct scientific and economic tests and research for its subscribers who paid annual fees for such service, was not entitled to the exemption because its work was not exclusively of a charitable nature; and wherein the court say that: "Moreover it does not seem to us that the prosecutor is engaged exclusively in scientific and educational work as contemplated by the words of the Statute. Its charter does not so limit it. It is not enough that the work be scientific and educational, as doubtless in a broad sense this work was, but it must be devoted exclusively to such objects. The facts here sustain the conclusion below that the work was not exclusively scientific and educational."

The facts detailed show that Fleming Hospital, Inc., and Dr. J. V. Fleming are "one employment unit" as that term is defined by the statute quoted. The case of Texas Unemployment Compensation Commission v. Bass, 137 Tex. 1, 151 S. W.2d 567, cited by appellants in support of their contention to the contrary, is not in point. In that case partners owning several drug stores placed by agreement the exclusive control of separate stores in one partner. In the instant case Dr. J. V. Fleming had the exclusive control and management of the corporation as superintendent and operator, which position he can maintain by the vote of himself and his wife, who receive from the income of the corporation rentals, taxes and insurance on their private property leased to the corporation. They constitute two-thirds of the voting power of the corporation, and can control it as they see fit. It was, according to Dr. Fleming, incorporated for protection against damage suits against him for his acts done in connection with the hospital corporation, and the setup between himself and the corporation was admittedly "quite a convenience" and benefit to him in his practice of surgery and medicine. After the incorporation he continued to operate the hospital just as he had done privately before the incorporation. The corporation has no assets or property. He and his wife own two-thirds of whatever value the corporation has, and they own the property leased to it under a lease which they can terminate from year to year as they see fit; and the resolution of the directors placed him in absolute control of the corporation with authority to establish rules and regulations, employ or discharge all employees, and to fix the compensation or salaries paid, and to fix the charges for its services to the public; and he operates his private business and the hospital in connection with each other, he alone furnishing all the patients of the hospital corporation. These facts bring the instant case clearly within the decisions of the cases of Washington Oil Corporation v. State, Tex.Civ.App., 159 S.W.2d 517, wherein four separate corporations occupied the same building and offices, all engaged in the oil business, and employed common counsel, had common officers and employees, and under actual control of a Board of Directors, were held to be "a

single employment unit" within the meaning of that term as used in the statute involved; and Witherspoon Oil Co. v. State, 156 S.W.2d 579, writ of error refused, which was to the same effect.

In other jurisdictions the courts have construed identical statutes and make the test of taxability under the statutes to depend upon "whether the individual enterprises are controlled by the same interests." See Unemployment Compensation Commission v. City Ice & Coal Co., 216 N.C. 6, 3 S.E.2d 290, 292, which construed a statute identical with ours, and as reason for its construction the court say: "The view here presented is supported by, and is in keeping with, the general intent of the Unemployment Compensation Act. It regards corporate organization objectively and realistically, unencumbered by fictions of corporate identity, and thus, brushing aside form, deals with substance. 1 Fletcher, Cyclopedia Corporations, Perm.Ed., Sec. 45. It tends to aid a more effective administration of the Act in that the number of smaller units from which contributions are to be made will be reduced, while the benefits to be derived from the unemployment insurance will be extended to a larger number of individuals. See Unemployment Compensation Commission v. [Jefferson Standard Life] Ins. Co., 215 N. C. 479, 2 S.E.2d 584."

In the case of Maine Unemployment Compensation Commission v. Androscoggin, 137 Me. 154, 16 A.2d 252, 256, in discussing a statute identical with ours, the court say: "While it is true that a corporation is a separate entity from its stockholders, yet it is apparent that the legislature, when it enacted this statute, intended to go behind the corporate veil and discover actuality and if it were found that the company, although a corporation, were one so controlled, compel contribution. Otherwise, an individual intending to carry on a business of considerable magnitude, requiring the employment of many more than eight, could organize several corporations, each employing less than eight, escape contribution, and deprive many employees of the benefits intended by the Act."

And in the case of Milrose Co. v. Unemployment Compensation Commission, 126 N.J.L. 441, 19 A.2d 892, 893, the Supreme Court of New Jersey in discussing an identical statute say: " * * * This section is called the 'affiliate clause'. Its purpose is to prevent employing units splitting up into parts each employing less than eight individual employees so as to escape assessments for employers' contributions into the fund created by the statute from which to pay unemployment compensation. We think that these corporations were affiliated as contemplated by this provision of the statute and that the Commission rightly treated them as a single employing unit."

The judgment of the trial court is affirmed.